UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CRISTIAN FERNANDO GUTIERREZ-OCHOA,<br>also known as "Luis Miguel Martinez,"<br>"Fernando," "Guacho," and "La Palomo,"<br><br>Defendant. | CASE NO. 25-CR-035 (BAH) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its undersigned counsel, respectfully submits this sentencing memorandum for the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Cristian Fernando Gutierrez-Ochoa ("Defendant") to 168 months' imprisonment, three years of supervised release, forfeiture pursuant to the Court's preliminary order of forfeiture, and a mandatory $100 special assessment. *See* Dkt. No. 40. The Government's recommended sentence falls at the high-end of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 135 to 168 months' imprisonment, as calculated by the parties and the Probation Office. The maximum statutory sentence is 240 months.

I.   **INTRODUCTION**

Defendant was an armed money laundering operative of Cártel de Jalisco Nueva Generación ("CJNG"), intimately connected to CJNG's top leadership. He lived in the United States under a fictitious identity, without legal status, and in a house he helped the CJNG buy with drug proceeds. In that residence, Defendant held over $2.25 million U.S. dollars ("USD") in drug proceeds, numerous luxury items, and two untraceable firearms with ammunition.

1

The CJNG is one of the most violent and prolific cartels in Mexico, with control over substantial drug trafficking routes from Mexico into the United States—control it maintains through bribery, intimidation, and extreme violence. The CJNG imports tonnage quantities of illicit substances into the United States, including methamphetamine, cocaine, and fentanyl. It has expansive money laundering networks to transfer and deploy its drug proceeds in furtherance of its criminal agenda across borders. Nemesio Oseguera Cervantes, also known as "El Mencho" ("Mencho"), is the top leader of the CJNG and the father of Defendant's long-term girlfriend, Laisha Oseguera-Gonzalez ("Oseguera-Gonzalez").

For at least a year, Defendant was not only a willing participant—but also a significant beneficiary—of CJNG's drug trafficking and money laundering operations. Together with Mencho's daughter, Defendant enjoyed a CJNG-sponsored life of abundance in an exclusive residential neighborhood in Riverside, California. Defendant worked with other CJNG operatives to purchase that property under the name of a Mexican company owned and controlled by the CJNG for approximately $1.2 million USD in drug proceeds. Within that property, Defendant possessed numerous items of value, including vehicles, expensive jewelry, watches, clothes, and accessories, in addition to the millions in bulk cash, which were stored in duffle bags, luggage, and hidden in closet compartments.

To make that life possible, Defendant entered the United States illegally in or before 2022 and assumed a fictitious identity, not only to insulate himself from arrest here in the United States, but also to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2

While the Government's recommended 168-month sentence falls at the high end of the Guidelines' range, it is just and warranted, including because of Defendant's use of a fictitious identity, possession of untraceable firearms, control over approximately $2.25 million of drug proceeds in bulk cash, and ████████████████████████

## II.  FACTUAL BACKGROUND

### A. Offense Conduct

The following facts are drawn from the Joint Statement of Stipulated Facts. Dkt. No. 36 ("SOF").

From at least 2023 to November 19, 2024, Defendant conspired with others to transport, transmit, and transfer CJNG drug proceeds from Mexico to the United States, in an effort to conceal and disguise the nature, location, source, ownership, and control of the drug proceeds, in violation of 18 U.S.C. § 1956(a)(2)(B)(i) and 1956(h). *Id.* ¶ 1.

During the course and in furtherance of the conspiracy, Defendant was a member of the CJNG, connected to CJNG's top leadership. *Id.* ¶ 2. The CJNG controls substantial drug trafficking routes from Mexico into the United States and imports tonnage quantities of illicit substances into the United States, including methamphetamine, cocaine, and other drugs. *Id*. The CJNG also has expansive money laundering networks both in the United States and Mexico. *Id*.

Defendant knowingly conducted and participated in financial transactions with other CJNG money laundering operatives using CJNG drug proceeds. *Id.* ¶ 3. Defendant knew the financial transactions involved CJNG drug proceeds and were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the CJNG drug proceeds. *Id*. Defendant assumed a fictitious identity as "Luis Miguel Martinez" to live in the United States, in part, to further CJNG's money laundering activities in the United States. *Id*.

In November 2023, as part of a sophisticated money laundering operation, Defendant and his co-conspirators completed two wire transfers totaling approximately $1.2 million USD of CJNG drug proceeds from Mexico to the United States to purchase a residential property located at 1191 Pamplona Drive, Riverside, California 92508 ("Pamplona Property"). *Id.* ¶ 4. The title to the Pamplona Property is held by Pasion Azul, S.A. de C.V. ("Pasion Azul"), a Mexican entity owned and controlled by the CJNG. *Id*. Defendant and his CJNG co-conspirators titled the Pamplona Property in the name of Pasion Azul to make the purchase of the property look lawful, when in fact the property was purchased with CJNG's drug proceeds. *Id*.

Defendant knew that the purchase of the Pamplona Property titled in the name of Pasion Azul was designed to conceal and disguise the nature, location, source, ownership, and control of CJNG's drug proceeds. *Id*. Defendant lived at the Pamplona Property under his fictitious identity and furthered CJNG's money laundering activities in the United States from at least November 2023 until his arrest there on November 19, 2024. *Id*.

At the time of his arrest, Defendant possessed approximately $2.2 million USD of CJNG's drug proceeds in bulk cash at the Pamplona Property, in addition to multiple other items of value purchased with CJNG drug proceeds, including jewelry, watches, and vehicles. *Id.* ¶ 5; *see also* Exhibit ("Ex.") A (photos of the property and items of value seized upon Defendant's arrest). Defendant also used CJNG drug proceeds to purchase at least one vehicle under his assumed fictitious name and using a third-party's social security number. SOF ¶ 5. Defendant did so to hide his ownership and control of the car. *Id.* These drug proceeds were transferred and transmitted to the United States from or through a place outside the United States. *Id.*

Defendant admits the total amount of illicit funds laundered in the course and in furtherance of the conspiracy for which he had actual knowledge and involvement was over $3,500,000. *Id.* ¶

4

6. Defendant possessed an unregistered and untraceable "ghost" firearm and another firearm with an obliterated serial number at the Pamplona Property in connection with the underlying money laundering offense. *Id*. ¶ 7; *see also* Ex. B (photos of the seized firearms).

### B. Procedural History

On November 6, 2024, the Government filed a criminal complaint against Defendant in the U.S. District Court for the District of Columbia ("DDC"). On that same day, a Magistrate Judge in DDC issued a warrant for Defendant's arrest. On November 19, 2024, Defendant was arrested in Riverside, California, pursuant to that arrest warrant. The next day, on November 20, Defendant had an initial appearance before a Magistrate Judge in the Central District of California ("CDCA").

On January 31, 2025, Defendant was transferred to DDC, where he waived his right to an Indictment during an initial appearance. Dkt. No. 28; *see also* Dkt. No. 37 (waiver before this Court). On February 3, 2025, the Government filed a two-count Information, charging him with conspiracy to distribute at least five kilograms of cocaine and at least 500 grams of methamphetamine for importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)-(b), and 963 ("Count One"), and conspiracy to launder drug proceeds, in violation of 18 U.S.C. § 1956(a)(2)(B)(i) and (h) ("Count Two"). Dkt. No. 20. On June 20, 2025, Defendant was arraigned on the Information and entered a guilty plea to Count Two pursuant to a Plea Agreement. *See* Min. Entry, June 20, 2025; Dkt. No. 35 ("PA"). Pursuant to the same agreement, the Government agreed to seek the dismissal of Count One at sentencing.

### III.  PRESENTENCE INVESTIGATION REPORT

#### A. Statutory Penalties

Defendant faces a statutory maximum sentence of twenty years' imprisonment, a fine not to exceed $500,000 or twice the value of the property involved in the transaction, whichever is

greater, and a supervised release term of not more than three years, pursuant to 18 U.S.C. §§ 1956(a)(1), 1956(h), and 3583. PA ¶ 3; *see also* Dkt. No. 48 ("PSR") ¶¶ 4, 89. Defendant is ineligible for safety valve relief under U.S.S.G. § 4C1.1(a)(7). *See* PA ¶ 4(e); PSR ¶ 82; 18 U.S.C. § 3553(f)(2).

### B. Sentencing Guidelines

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Although the Guidelines are advisory, not mandatory, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.*; *United States v. Booker*, 543 U.S. 220, 222 (2005) (holding that the Guidelines were not mandatory). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46.

On October 8, 2025, the Probation Office issued a final Presentence Investigation Report ("PSR") and recommended a 123-month sentence, which factors in "the *US v. Smith* downward departure." Dkt. No. 49, at 2. The PSR's Guidelines calculation mirrors the parties' calculation as stated in the Plea Agreement. PSR ¶¶ 28-41, 44, 88; PA ¶ 4.

Specifically, because Defendant laundered more than $3,500,000, the base offense level is 26, pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(J). PSR ¶¶ 5, 29. Defendant also knew that the funds transferred, transported, and transmitted were CJNG drug proceeds, increasing the offense level by six points, pursuant to U.S.S.G. § 2S1.1(b)(1)(A) and (B)(i). *Id.* ¶¶ 5, 30. Given the sophisticated money laundering operation and conviction under 18 U.S.C. § 1956, Defendant's offense level increases by another four points, pursuant to U.S.S.G. § 2S1.1(b)(2)(B) and (b)(3).

*Id.* ¶¶ 5, 31-32. After a three-level adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a)-(b), the total offense level is 33. *Id.* ¶¶ 5, 41. Because Defendant possessed firearms in connection with the offense, he is ineligible for relief under the zero-point offender and safety valve provisions. *Id.* ¶¶ 6, 10.e, 40; *see also* U.S.S.G. §§ 4C1.1(a)(7) and 5C1.2(a)(2).

### C. Defendant's PSR Objections

#### 1. Defendant's Objection to Paragraph 3 Should Be Rejected

Defendant "objects to the reference or use of any unproven and unreliable allegations contained in the Information" in paragraph 3 of the PSR. Dkt. No. 44-1, at 2. Paragraph 3, however, describes the Information accurately, as Defendant concedes. *Id.* (noting the PSR contained "a correct statement of the Information"). For all arguments herein about Defendant's other relevant conduct, the Government has attached exhibits as evidence and disclosed the same to Defendant in advance of filing this memorandum.

#### 2. Defendant's Objection to Paragraphs 48 and 52 Should Be Rejected

Defendant also objects to references to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ noting he "has not received any discovery from the Government in relation to this information." *Id.* The Government has produced the relevant documents to Defendant. *See* Ex. C (▇▇▇▇▇▇▇ disclosed on October 16, 2025, under Bates numbers 00000298-00000299); Ex. C-1 (translation of Ex. C); Ex. D (▇▇▇▇▇▇▇▇▇▇ disclosed on October 16, 2025, under Bates numbers 00000300-00000303); Ex. D-1 (translation of Ex. D); PSR ¶¶ 48-51; PSR at 22 (Probation Office's response to Defendant's objection).

### IV.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

After calculating the applicable Guidelines range, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50. In doing so, a district court "may not presume that the Guidelines range is

7

reasonable but must make an individualized assessment based on the facts presented." *Id.* at 39.

The factors courts must consider pursuant to § 3553(a) include: the nature and circumstances of the offense (§ 3553(a)(1)); the history and characteristics of the defendant (same); the need for the sentence to reflect the seriousness of the offense and promote respect for the law (§ 3553(a)(2)(A)); the need for the sentence to afford adequate deterrence (§ 3553(a)(2)(B)-(C)); and the need to avoid unwarranted sentence disparities among defendants with similar records and conduct (§ 3553(a)(6)). In this case, § 3553(a) factors weigh decisively in favor of the recommended term of incarceration.

### A. Nature and Circumstances of the Offense, and the Need for the Sentence to Reflect the Severity of the Offense

The money laundering offense to which Defendant pled guilty is grave enough in its own right given Defendant's CJNG membership, his strong ties to CJNG's top leadership, and intimate knowledge that the CJNG imports tonnage quantities of drugs into the United States. SOF ¶¶ 2-3. The CJNG kills, tortures, and corrupts to traffic staggering quantities of cocaine, methamphetamine and other drugs into the United States and elsewhere—all for profiting and enrichment, which in turn fund the cycle of violence, ravaging countless lives and communities. Defendant did CJNG's bidding and enabled these acts, including while living in the United States without legal status, with two untraceable firearms and ammunition, and under a fictitious identity.

But that is not his whole story.

Defendant was not just a CJNG money launderer earning a commission. He was a significant and direct beneficiary of CJNG's violent narcotics operations: He enjoyed a luxurious lifestyle in the United States with Mencho's daughter, spending Mencho's drug proceeds, and

8

living in a property the CJNG arranged to buy for them. *See* Ex. A; *see also* SOF ¶¶ 4-6 (noting the property and other items bought with drug proceeds); PSR ¶¶ 10, 56, 58.[1]

Meanwhile, Defendant adopted a fictitious identity not only to further CJNG's money laundering activities, but also to serve himself. *See* SOF ¶ 3. For instance, he bought a car with drug proceeds, *id.* ¶ 5; ███████████████████████████████ PSR ¶ 76;[2] and lied to the State of California to obtain an ID card and a driver's license. Ex. F (showing an interim driver license and an ID card issued by the State of California under "Luis Miguel Martinez," found at Defendant's residence; notably, Defendant's ID card was in a bag holding ammunition).

Defendant also corrupted our community by lying to several businesses to obtain benefits or services, which probably would have been denied otherwise. For example, ███████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ PSR ¶ 74. He obtained car insurance using his fictitious name—including for a car that he purchased with funds he borrowed under his fictitious name and under someone else's social security number. *See* Ex. G (showing car insurance paperwork found at Defendant's residence under "Luis Miguel Martinez"); Ex. H (showing photo of correspondence from "Westlake Financial" addressed to "Luis Martinez," found at Defendant's residence, as well as records obtained from Westlake Financial Services, a privately held finance company, showing

---

[1] *See also* Ex. E (showing Identification card ("ID card") for "Laisha Michelle Oseguera Gonzalez," Mencho's daughter, found at the Pamplona Property, alongside another identification card and items for a male believed to be Mencho's grandson; both were present at the property when Defendant was arrested).
[2] *See also* 26 U.S.C. § 7206 (criminalizing declaration under penalty of perjury for "any return, statement, or other document" with materially incorrect or false information).

Defendant's signed application to borrow $43,408 USD under "Luis M. Martinez," using someone else's social security number and the Pamplona Property address).

The gravity of Defendant's conduct cannot be overstated. Only a significant sentence as recommended by the Government is sufficient to reflect the seriousness of Defendant's offense and his repeated and blatant disregard for the law.

### B. The History and Characteristics of Defendant

Defendant had enough opportunities and meaningful warnings in life to steer clear of crime as an adult. He did not. Instead, he became a dangerous, trained CJNG operative.

Defendant reported being ███████████████ in Mexico, ███ ███ from and a ███████████ with his parents. PSR ¶ 54. He was ███████ ████████████████████ *Id.* He ███████████████ ████████████████ *Id.*

Defendant also had meaningful and undoubtedly painful warnings about the consequences of crime: ███████████████████████████████████████ ██████████████████████████████████ Having lived through such realities, Defendant must have appreciated the pain and harm his actions inflicted on others, and the cruelty the CJNG inflicted on countless more.

Yet, when he was about twenty-three years old, ███████████████████ ████████████████████████████████████████ ███



Ex. C at 1. He then fled to the United States shortly after ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ assumed a fictitious identity, and resumed a life of crime on this side of the border. *See* PSR ¶¶ 58-59, 71.

While in the United States, Defendant demonstrated that he was indeed a dangerous and trained CJNG operative embedded in our community. Shortly before his arrest in November 2024, Defendant used counter-surveillance methods while driving to evade DEA agents who were surveilling him at the time. *See* Dkt. No. 1-1. As a result, the surveillance was terminated. *Id.* ¶¶ 31, 33. Defendant then followed DEA agents into a parking lot where the agents were meeting to discuss their surveillance. *Id.* He parked his car in that parking lot and used his rear-view mirror to surveille the agents. *Id.* Noticing Defendant's presence, DEA agents left the parking lot in their separate cars. *Id.* Defendant then followed one of the agents for a while, despite the agent making multiple turns and lane changes. *Id.* Ultimately, another DEA agent had to pull alongside Defendant to prevent him from further following the other agent. *Id.* Defendant's training in such counter-surveillance methods is consistent with the alleged violent act in Mexico and is particularly concerning.

After his arrest in CDCA, Defendant also provided false information to the probation officer who interviewed him at the time. For instance, he told the CDCA probation officer that he ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓—which he did not. *See* Ex. I at 2 (pretrial services report prepared for the Honorable Alicia G. Rosenberg before Defendant's initial appearance in CDCA). Defendant did not simply refuse to provide an incriminating answer; he misrepresented a fact.

The facts and records in this case show Defendant's commitment to a life of crime and evading responsibility, including fleeing Mexico shortly after the November 2021 incident, living in the United States to do CJNG's bidding, without a legal status, under a fictitious identity, and

holding untraceable firearms. The above history and characteristics weigh heavily in favor of the recommended sentence.

### C. The Need for the Sentence to Afford Adequate Deterrence

Deterrence is a major sentencing factor in this case, both because of CJNG's expansive operations and Defendant's repeated CJNG-enabling and self-serving illegal conduct. Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by a given defendant. 18 U.S.C. § 3553(a)(2)(B)-(C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010) (discussing goals of general and specific deterrence).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The CJNG is able to run and pay for expansive operations, including within the United States, because it recruits and arms operatives like Defendant on both sides of the border to protect its drug proceeds. The CJNG has become the menace it is today due to such operatives, who enable the cartel to profit and expand. In turn, the CJNG operatives—by virtue of their membership within this brutal cartel—act with a total sense of impunity, as if they are deputized to be above the law by virtue of their membership. A significant sentence in this case is crucial to counteract such misperceptions and to remind all concerned that punishment by the U.S. criminal justice system for cartel-related activities is not only certain, but severe. The devastation and cost CJNG members inflict are incompatible with anything less.

*Specific Deterrence*

Time and again, Defendant has shown his disregard for the law. The recommended sentence is necessary to impose a serious reckoning on Defendant, particularly because Defendant

is young enough to return to society after his prison sentence in this case but embedded enough within the CJNG's top leadership web to be pulled back into his old ways upon release.

Defendant has been part of the CJNG ███████████████████████████ ███████████████████████████████████████████—which raises concerns of recidivism. PSR ¶¶ 56-57.³ Given these ties, Defendant may not have the option to steer clear of the CJNG after his release. And although Defendant will be deported to Mexico after completing his sentence in this case, he is from Guadalajara, CJNG's stronghold and headquarters—where many of the CJNG top leaders still reside and rule. PSR ¶ 58. The Government's concern for recidivism is well-grounded.

Therefore, to protect the public from further crimes by Defendant, the sentence in this case must be severe enough to impress upon him that imprisonment is not just a hiatus from crime—it is a precious opportunity for a U-turn and a last warning.

### D. Unwarranted Sentencing Disparities

Finally, § 3553(a)(6) requires a specific evaluation of similarly situated defendants "to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." When determining whether a sentence creates an unwarranted disparity, courts should consider, *inter alia*, a defendant's criminal history, total offense level, Guidelines range, acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, and whether and to what extent cooperation was a factor in sentencing. *See, e.g.*, *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" and not unwarranted due to differences in conduct). A

---

³ Defendant's sister is also married to Ruben Oseguera-Gonzalez, CJNG's former second-in-command, who was convicted last year before this Court.

defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

While the average and median sentences provided in the PSR, and the Probation Office's sentencing recommendation, are helpful, they do not reflect—or reflect sufficiently—the uniquely aggravating aspects of this case, including: 1) Defendant's membership with a notoriously prolific and violent drug cartel and his close ties to its top leadership; 2) Defendant's wanted status in Mexico for a crime of violence on behalf of the CJNG and at the direction of Mencho; 3) his possession of two untraceable firearms in relation to the underlying offense; 4) his living in the United States without legal status and under a fictitious identity to evade law enforcement on both sides of the border; and 5) his commission of other crimes, such as filing fraudulent documents with the Federal Government (i.e., federal income tax return) and the State Government in California, which are not reflected in his criminal history category. PSR ¶ 111.

The Government's recommended sentence of 168 months' imprisonment accounts for the aggravating aspects noted above without leading to unwarranted sentencing disparities. The Government has identified similar cases as presented below. In selecting these cases, the Government considered similarities, such as defendants' conduct, Guidelines range, criminal history, extent of cooperation, acceptance of responsibility, and sentence.

### Bianca Acedo-Ojeda, 15-CR-950 (S.D.C.A. 2021)

Bianca Acedo-Ojeda ("Acedo-Ojeda") was a money launderer for a drug trafficking organization with ties to the Sinaloa Cartel, who pled guilty to conspiracy to launder drug proceeds, in violation of 18 U.S.C. § 1956(h). Acedo-Ojeda coordinated couriers for money pickups, knowing the money was the proceeds of drug trafficking. She performed this role for

14

approximately 15 months, using a currency exchange entity.

Acedo-Ojeda was held accountable for laundering more than $9,500,000 USD. Her base offense level was 28, with a six-level increase because of knowledge that the proceeds were from drug trafficking. She received another four-level increase for being in the money laundering business. Acedo-Ojeda was ineligible for the safety valve adjustment but received a two-level reduction under U.S.S.G. § 5K2.0 for a combination of circumstances. She had no known criminal history. With a total offense level of 33 and a Guidelines range of 135 to 168 months, Acedo-Ojeda received a 120-month sentence. Cooperation was not a factor at sentencing.

Defendant's Guidelines range, as determined by the parties and the Probation Office, is the same as Acedo-Ojeda's range. Although Defendant has conceded to a lesser laundered amount, he was an armed operative, was connected to CJNG's top leadership, and used sophisticated methods of laundering. He is also ███████████████████████████████ on behalf of the CJNG's top leader. These unique aspects more than warrant the higher recommended sentence here.

### Carlos Mauricio Silva-Missas, 17-CR-445 (P.R. 2023)

Carlos Mauricio Silva-Missas pled guilty to money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). For over two years, Silva-Missas solicited money laundering contracts and coordinated multiple money pickups on behalf of a drug trafficking organization to repatriate drug proceeds to recipients in Central and Southern America, including through wire transfers. Over the course of the conspiracy, Silva-Missas laundered at least $3.2 million USD, using bank accounts in the United States, among other methods.

Silva-Missas's base offense level was 24, for laundering more than $1.2 million USD. He received a six-level enhancement because of knowledge that the proceeds were from drug

trafficking and another four-level increase for being in the money laundering business. With a three-level reduction for acceptance of responsibility and a Criminal History Category I, his total offense level was 31, with a Guidelines range of 108 to 135 months' imprisonment. Silva-Missas received a 120-month sentence.

Compared to Silva-Missas, Defendant laundered a similar amount of drug proceeds, used sophisticated methods, and was armed. The possession of two untraceable firearms in relation to his crime, in and of itself, makes the 48-month difference in sentences warranted: Defendant presumably was ready to use those firearms, which were kept by his bedside. His ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ not only corroborates such readiness but also explains his need to assume a fictitious identity while living in the United States—i.e., to evade accountability in Mexico. Because of these aggravating factors, the Government's recommended 168-month sentence would not lead to undue disparity between these two defendants.

### Jose Manuel Martinez Gomez, 24-CR-43 (E.D.K.Y. 2025)

Jose Manuel Martinez Gomez ("Martinez Gomez") pled guilty to money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). He was a money broker for an organization that aided the CJNG by gathering, laundering, and repatriating drug proceeds. Martinez Gomez worked for commissions or a percentage of the money he laundered successfully, which was estimated to be around $5.4 million in total.

Martinez Gomez's base offense level was 26. He received a six-level enhancement because he knew he was laundering drug proceeds, and another four-level increase for being in the money laundering business. After a two-level reduction under the first-time offender provision and another three-level reduction for timely acceptance of responsibility, Martinez Gomez's total

offense level was 31, with a Guidelines range of 108 to 135 months' imprisonment. Martinez Gomez was sentenced to 100 months of imprisonment. Cooperation was not a factor at sentencing.

Martinez Gomez's case is a helpful comparator because it highlights the contrast between a low-level money launderer and Defendant, with his top-CJNG connections, CJNG-sponsored affluent life, two untraceable firearms, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. All these factors weigh decidedly in favor of a top-range sentence in this case.

## V. CONCLUSION

For the reasons set forth above, the Government recommends 168 months of imprisonment, three years of supervised release, forfeiture pursuant to the Court's preliminary order of forfeiture, and a mandatory $100 special assessment.

Respectfully Submitted,

Dated: October 24, 2025

MARGARET A. MOESER, Chief
Money Laundering, Narcotics and
Forfeiture Section
Criminal Division
U.S. Department of Justice

By: */s/ Lernik Begian*
Lernik Begian
Douglas Meisel
Kaitlin Sahni
Trial Attorneys
Money Laundering, Narcotics and
Forfeiture Section
Criminal Division
U.S. Department of Justice
1400 New York Ave N.W.
Washington D.C. 20530
lernik.begian@usdoj.gov
douglas.meisel@usdoj.gov
kaitlin.sahni2@usdoj.gov

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of this sentencing memorandum was served via email and CM/ECF on counsel of record for Defendant, this 24th day of October 2025.

By:    */s/ Lernik Begian*
Lernik Begian
Trial Attorney
Criminal Division
U.S. Department of Justice
Money Laundering, Narcotics and
Forfeiture Section